UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------X

J.R.U.,

                        Petitioner,

        -v-

KENNETH GENALO, et al.,

                      Respondents.

--------------------------------------------------------------------X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:_____
> DATE FILED:  06/29/2026

26-cv-4332 (LJL)

**OPINION AND ORDER**

LEWIS J. LIMAN, United States District Judge:

Petitioner J.R.U. petitions, under 28 U.S.C. § 2241, for a writ of habeas corpus.[1]  Dkt.

No. 1 (the "Petition" or "Pet.").  For the following reasons, the Court grants Petitioner's request

for a hearing and defers final ruling on the petition for a writ of habeas corpus.

## BACKGROUND

J.R.U. is a 49-year-old father of three.  Pet. ¶ 18.[2]  He was born in La Union, El Salvador.

*Id.* ¶ 18.  While in El Salvador working as a bus owner and driver, he was the victim of extortion

by members of the Barrio 18 and Mara Salvatrucha ("MS-13") gangs.  *Id.* ¶¶ 19–20.  Gang

members forced him to pay between $20 and $25 a week for each bus his company owned.  *Id.* ¶

20.  Because the gang had killed several bus drivers in the transportation union for failure to

comply with fee demands, he feared for his life and that of his family if he declined to pay.  *Id.*

¶¶ 19–20.  In 2008, his brother, who also drove one of the family's buses, was murdered in his

---

[1] Petitioner also filed a motion to proceed in this action using his initials.  Dkt. No. 3.
Respondent did not oppose the request and the Court granted that motion on May 28, 2026.  Dkt.
No. 9.
[2] The Court accepts the allegations of the Petition as true.  *J.P.M. v. Arteta*, 807 F. Supp. 3d 265,
273 n.11 (S.D.N.Y. 2025).

home by Barrio 18 gang members.  *Id.* ¶ 21.  J.R.U. suspects that the gang murdered his brother

because he had expressed an unwillingness to continue paying the extortion fees.  *Id.*  In or

around 2013, J.R.U., then in his capacity as vice president of the bus driver's union, asked the

local police for protection from the gang's extortion efforts.  *Id.* ¶ 23.  Instead, J.R.U. was

himself wrongfully arrested and charged with extortion.  *Id.*  After he was held in jail for

approximately 3.5 months, he was found innocent of the charge by a judge.  *Id.* ¶ 23.  At that

point, he stopped driving the bus out of fear of gang retaliation and eventually decided to sell his

bus and leave the country to avoid further harm from the gangs.  *Id.* ¶ 24.

J.R.U. entered the United States on a nonimmigrant visa in November 2015 and took

residence in New York.  *Id.* ¶ 25.  On January 22, 2025, after J.R.U. had been in the United

States for nearly ten years, the Department of Homeland Services ("DHS") issued a Notice to

Appear ("NTA") to him by mail, charging him as removable pursuant to 8 U.S.C.

§ 1227(a)(1)(B).  *Id.* ¶ 26.  That same day, ICE arrested J.R.U. outside of his home.  Dkt. No. 19-

11 at 2.  He has been detained at the Orange County Correctional Facility (the "Orange County

Jail" or "OJC") in Goshen, New York ever since.  Pet. ¶ 26.  Upon his arrest, Petitioner learned

for the first time that a warrant for his arrest existed in El Salvador.  *Id.* ¶ 27.

As relief from removal, J.R.U. timely sought asylum, withholding of removal, and

protection under the United Nations Convention Against Torture and Other Cruel, Inhuman, or

Degrading Treatment or Punishment ("CAT"), to which the United States is signatory and which

is enforceable under United States law and regulations.  *Id.* ¶ 29; *see* Pub. L. No. 105-277,

codified as Note to 8 U.S.C. § 1231.  J.R.U. claimed that should he be removed to El Salvador,

he will be harmed or killed: (1) by gang members who seek to retaliate against him; or (2) by

Salvadoran officials, who, in light of his label as a gang member, will incarcerate and torture him under El Salvador's State of Exception ("SOE"). *Id.*

On May 21, 2025, an immigration judge ("IJ") issued a written decision denying J.R.U.'s applications for relief from removal. *Id.* ¶ 30; Dkt. No. 19-3. The IJ denied asylum, finding that J.R.U.'s application was barred by 8 U.S.C. § 1158(b)(2)(A)(V), on grounds that his forced extortion payments to operate his bus constituted material support for MS-13, which he separately found to be a Tier III terrorist organization during the time of those payments. Pet. ¶ 30. Separately, the IJ held that J.R.U. is ineligible for asylum based on his finding that J.R.U.'s past and future persecution did not, and would not, occur on account of a statutorily protected ground. *Id.* ¶ 31. The IJ further denied J.R.U.'s applications for withholding of removal and CAT protection, despite finding it "more likely than not" that J.R.U. will be incarcerated upon removal to El Salvador in light of ICE's unsubstantiated allegations of gang membership. *Id.*

J.R.U. appealed to the Board of Immigration Appeals ("BIA"), which dismissed his appeal on November 18, 2025 on the basis that his application lacked a nexus to a protected ground. *Id.* ¶ 32; Dkt. No. 19-8. On November 30, 2025, J.R.U. petitioned for review of the BIA's decision in the United States Court of Appeals for the Second Circuit. Pet. ¶ 33. That appeal remains pending. *Id.*

Petitioner has sought release from detention in the course of the proceedings as to the merits of his asylum and CAT/withholding application. On April 25, 2025, J.R.U. appeared before the immigration court for a custody redetermination hearing, at which the IJ placed the burden on J.R.U. to establish that he posed neither a danger to the community nor a flight risk. *Id.* ¶ 34. At that hearing, DHS argued that J.R.U. was ineligible for bond under 8 U.S.C. § 1226(c)(1)(D), because he was both a member of a terrorist organization (MS-13) and for

3

having engaged in terrorist activity.  *Id.* ¶ 36.  On May 14, 2025, the IJ determined that J.R.U. was eligible for release from immigration custody and, after analyzing his application for custody redetermination, orally ordered J.R.U.'s release on bond of $35,000.  *Id.* ¶¶ 1, 39; *see* Dkt. Nos. 19-1, 19-2, 19-12.  On June 3, 2025, the IJ released a written order rejecting DHS's argument that J.R.U. was subject to mandatory detention, finding instead that (1) there was no evidence to show that he was a member of MS-13, and that (2) MS-13 did not qualify as a Tier III terrorist organization while J.R.U. made the extortion payments at issue.  Pet. ¶¶ 40–42; Dkt. No. 19-4.  He then determined that J.R.U. was eligible for release because he was not a danger to the community nor a significant risk of flight.  Pet. ¶¶ 45–56; *see generally* Dkt. No. 19-4 at 6–9.[3]

On the same day, DHS filed a Form EOIR-43 Notice of Intent to Appeal Custody Redetermination with the BIA, thereby invoking a provision through which it automatically stayed the IJ's bond grant.  Pet. ¶ 47.[4]  On August 22, 2025, just before the automatic stay was set to expire, the BIA granted DHS's bond appeal and remanded proceedings.  *Id.* ¶ 49.

---

[3] The June 3, 2025 written decision in which the IJ stated that "based on the scant record evidence before the Court, it finds that the Respondent is not considered properly included within the" material support bar "as proffered by" DHS post-dates the same IJ's May 21, 2025 denial of asylum on the basis that the material support bar precluded Petitioner's application for asylum and withholding of removal.  *Compare* Dkt. No. 19-3 *with* Dkt. No. 19-4.  The IJ did note on the record at the May 14 hearing with respect to J.R.U.'s application for bond that the bond and asylum proceedings are "separate" and that the record in each proceeding is kept "apart from other records and proceedings."  Dkt. No. 19-12 at 6.

[4] Pursuant to 8 C.F.R. § 1003.19(i)(2), "[i]n any case in which DHS has determined that an alien should not be released . . . any order of the immigration judge authorizing release (on bond or otherwise) shall be stayed upon DHS's filing of a notice of intent to appeal the custody redetermination (Form EOIR-43) with the immigration court within one business day of the order," and "[t]he decision whether or not to file form EOIR-43 is subject to the discretion of the Secretary."  A large number of courts, including the undersigned, have held application of the automatic stay to violate the Due Process Clause.  *See O.F.C. v. Almodovar*, 2026 WL 74262, at *15 (S.D.N.Y. Jan. 9, 2026); *J.M.P. v. Arteta*, 807 F. Supp. 3d 265, 291-99 (S.D.N.Y. 2025) (citing cases).

The IJ held a second bond hearing after the remand on September 15, 2025. *Id.* ¶ 50. The IJ noted that the BIA had instructed that he consider both "mandatory detention" and "flight risk," but noted that "if I find mandatory detention, I don't see the point of getting to flight risk," but "the Board has ordered it, so we're going to do what the Board says." Dkt. No. 19-4 at 8. As at the original hearing, the IJ placed the burden of proof on J.R.U. Pet. ¶ 50. At the close of the hearing, the IJ denied bond in an oral decision on grounds that J.R.U. had "failed to meet his burden." *Id.* ¶ 51. At that point, the IJ noted that he had not "come to a conclusion on the issue of mandatory detention," but that "even if he was not subject to it, he's still, I'm still not going to grant bond because he's a very high flight risk." Dkt. No. 19-14 at 51. Therefore, the IJ "figured it's best just to issue the order now and get the parties moving on the issue." *Id.*[5]

J.R.U. appealed the IJ's decision on September 24, 2025. Pet. ¶ 52. On October 14, 2025, the IJ issued a written memorandum, in which the IJ held that J.R.U. is subject to mandatory detention pursuant to 8 U.S.C. § 1226(c), for having materially supported a Tier III terrorist organization by making extortion payments to MS-13 under threat of death. *Id.* ¶¶ 52–53; Dkt. No. 19-7. Alternatively, the IJ found that J.R.U. had failed to meet his burden of proof to establish that he is not a flight risk. Pet. ¶ 53. The IJ found as much on the reasoning that "the record indicates that [J.R.U.'s] manner of entry into the country was marred by deception and failure to abide by the terms of his visa," and because he "has an order of removal entered against him, which gives him no incentive to appear at any future court date." Dkt. No. 19-7 at 7–8.

---

[5] In a colloquy at the September 15, 2025 second custody determination hearing, the IJ noted his practice to provide a written memorandum and not just a "brief order form" only where a party appeals the bond determination to the BIA. Dkt. No. 19-14 at 45; *id.* at 49 ("Okay, and we'll do a bond memorandum if you go forward with the appeal.").

J.R.U. has been jailed in ICE custody since on or about January 22, 2025.  Pet. ¶ 5.

## PROCEDURAL HISTORY

Petitioner filed the instant petition for a writ of habeas corpus on May 23, 2026.  Dkt. No. 1.  The petition was accompanied by several exhibits, including an affirmation of Petitioner's counsel in his bond proceedings, Karene Brown, and the various declarations and orders from his bond proceedings and the associated IJ, BIA, and federal court decisions.  Dkt. Nos. 1-1–1-11.  On May 26, 2026, the Court ordered the parties to appear for an initial conference on May 27, 2026, and further ordered that Petitioner not be removed from the United States absent further order of the Court.  Dkt. No. 6.  The parties submitted a proposed briefing schedule on May 29, 2026, in which they agreed that Respondents would oppose the Petition by June 8, and the Petitioner would reply to that opposition by June 12.  Dkt. No. 10.  The Court adopted that proposed schedule.  Dkt. No. 11.  Respondents sought an extension for their time to respond on June 8, 2026, with the consent of the Petitioner, Dkt. No. 13, which the Court granted, permitting the response to be filed June 9, 2026, Dkt. No. 14.  Respondents submitted their opposition brief, a declaration of Kenneth Genalo, and a return with fourteen exhibits, on June 10.  Dkt. Nos. 17–19.  Petitioner requested an extension for their time to file a reply, Dkt. No. 20, which the Court granted, giving Petitioner until June 15, 2026, Dkt. No. 21.  Petitioner submitted his reply brief on June 15, 2026.  Dkt. No. 22.  The Court held a hearing on the Petition on June 17, 2026.

## LEGAL STANDARD

Petitioner proceeds under 28 U.S.C. § 2241, which "authorizes a district court to grant a writ of habeas corpus whenever a petitioner is 'in custody in violation of the Constitution or law or treaties of the United States.'"  *Wang v. Ashcroft*, 320 F.3d 130, 140 (2d Cir. 2003) (quoting 28 U.S.C. § 2241(c)).  "Federal courts have jurisdiction to hear habeas corpus claims by noncitizens challenging the constitutionality of their detention."  *Lopez v. Sessions*, 2018 WL

6

2932726, at *6 (S.D.N.Y. June 12, 2018) (citing *Demore v. Kim*, 538 U.S. 510, 516–17 (2003)).

A petitioner bears the burden of establishing his allegations by a preponderance of the evidence.

*Gotti v. United States*, 622 F. Supp. 2d 87, 91 (S.D.N.Y. 2009) (citing *Whitaker v. Meachum*,

123 F.3d 714, 716 (2d Cir. 1997)).  "Although § 1226(e) provides that '[n]o court may set aside

any action or decision by the Attorney General under this section regarding the detention or

release of any [noncitizen] or the . . . denial of bond or parole,' '[t]he Supreme Court has made

clear that § 1226(e) does not . . . limit habeas jurisdiction over constitutional claims or questions

of law.'"  *G.F.F. v. Francis*, 2025 WL 3141735, at *3 (S.D.N.Y. Nov. 10, 2025) (quoting

*Velasco Lopez v. Decker*, 978 F.3d 842, 849–50 (2d Cir. 2020)).

## DISCUSSION

Petitioner has never been charged with, arrested for, or convicted of any crime in the

United States.  He entered the United States lawfully.  His only wrong appears to be that he

overstayed his visa, which he did because his brother was murdered in his home country of El

Salvador and he fears that if he is returned to that country he will face death or serious bodily

injury either at the hands of the gangs or those of the government.  The Government has never

shown that he is a danger to the community or a risk of flight.  To understand why the Executive

Branch nonetheless feels compelled to hold him for what is now a year and a half, it is necessary

to describe some of the laws that govern persons in removal and deportation proceedings.

## I.    Statutory and Legal Framework

### A.    CAT and Asylum Relief

United States law subjects people such as Petitioner who have overstayed their visas to

deportation.  Section 1227(a) of Title 8 provides that "[a]ny alien . . . in and admitted to the

United States shall, upon the order of the Attorney General, be removed if the alien is within one

or more of the following classes of deportable aliens."  8 U.S.C. § 1227(a).  The Attorney

General's power has been delegated to the immigration judges to "determine removability," grant withholding of removal and CAT relief, and decide eligibility for various kinds of admissibility waivers. 8 C.F.R. § 1240.1(a)(1).   The category of persons who can be removed or deported is broad.  It includes any noncitizen "present in the United States in violation of this chapter" or any other law of the United States, 8 U.S.C. § 1227(a)(1)(B), such as by having entered the country without inspection or having overstayed or exceeded the terms of their visas. It also includes those who "procured a visa or other documentation by fraud," *id.* § 1227(a)(1)(G), noncitizens convicted of certain criminal offenses, including "crimes of moral turpitude," "aggravated felony," and "failure to register as a sex offender," *id.* §§ 1227(a)(2)(A), noncitizens who fail to register or submit false documents, *id.* § 1227(a)(3), and noncitizens that have engaged in criminal activities or otherwise defined "terrorist activities" that endanger national security, *id.* § 1227(a)(4), among others.

It is not disputed that Petitioner is removable under Section 1227(a)(1)(B).  He entered the United States on a temporary non-immigrant visa, which expired in 2015.  *Id.* ¶ 25.  He is now in the United States in violation of the laws of the United States.

Consistent with the country's obligations under international law and treaty, *see generally I.N.S. v. Stevic*, 467 U.S. 407, 414–29 (1984), however, Congress has provided protection from removal for noncitizens who have fled to this country from a well-founded fear of persecution or who would face torture if returned to their country of origin.  *See Johnson v. Guzman Chavez*, 594 U.S. 523, 528 (2021).

Under the INA, a person who is "unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, [their home] country because of persecution or a well-founded fear or persecution on account of race, religion, nationality,

8

membership in a particular social group, or political opinion" can apply for asylum.  8 U.S.C. § 1101(a)(42)(A).  He may do so "either by affirmatively applying for asylum or raising a claim for asylum in removal proceedings."  *Wassily v. Bondi*, 150 F.4th 100, 101 (2d Cir. 2025).  Asylum "is a category of discretionary relief available to a noncitizen who qualifies as a 'refugee' under 8 U.S.C. § 1101(a)(42)(A)."  *Id.* at 105.  "If granted asylum, a noncitizen is protected from removal and authorized to work in the United States and travel abroad."  *Id.* at 101 (citing 8 U.S.C. § 1158(c)(1)).

Even if a non-immigrant cannot establish a basis for asylum, Federal law prevents the Executive from sending him or her to a country where the noncitizen's "life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1231(b)(3)(A).  "There are two paths for seeking withholding of removal."  *Johnson*, 594 U.S. at 530.  First, under § 1231(b)(3)(A), the Attorney General may not remove an alien to a country where the noncitizen's life of freedom would be threatened on one of the proscribed grounds.  8 U.S.C. § 1231(b)(3)(A) ("the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion.").  "Second, the alien may seek withholding under regulations implementing the Convention Against Torture . . . which prohibits removal of an alien to a country where the alien is likely to be tortured."  *Johnson*,  594 U.S. at 530–31 (citing 8 C.F.R. §§ 208.16–208.17, 1208.16–1208.17).  "[A]n alien subject to the standard removal process typically applies for withholding during the course of his removal proceedings."  *Id.* at 531.  "If an alien is granted withholding-only relief, DHS may not remove the alien to the country designated in the removal order unless the order of withholding

9

is terminated." *Id.* Withholding of removal is "country specific" relief, *INS v. Cardoza-Fonesca*, 480 U.S. 421, 428 n.6 (1987); that is, nothing prevents DHS "from removing [the] alien to a third country other than the country to which removal has been withheld or deferred," 8 C.F.R. §§ 208.16(f), 1208.16(f).

Here, as relief from removal, J.R.U. sought asylum, withholding of removal, and protection under the CAT. Pet. ¶ 29.

### B.    Detention of Noncitizens in Removal Proceedings

The INA dictates either discretionary or mandatory detention for different classes of noncitizens in removal proceedings or seeking relief from removal. Section 1226(a) "sets out the default rule." *Jennings v. Rodriguez*, 583 U.S. 281, 288 (2018). Under that subsection, on a warrant issued by the Attorney General, a noncitizen "*may* be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a) (emphasis supplied). Detention is not mandatory for those categories of noncitizens. "Except as provided in subsection (c) of this section," the Attorney General "may release" an alien detained under § 1226(a) "on . . . bond" or "conditional parole." 8 U.S.C. § 1226(a)(2)(B); *Johnson*, 594 U.S. at 527. That determination as to whether the noncitizen "may" be detained turns on whether they pose a danger to the community or pose a flight risk. *See Velasco Lopez v. Decker*, 978 F.3d 842, 849 (2d Cir. 2020) (citing *Matter of Adeniji*, 22 I.&N. Dec. 1102, 1112 (BIA 1999)).

"Section 1226(c), however, carves out a statutory category of aliens who may *not* be released under § 1226(a)." *Jennings*, 583 U.S. at 289. Section 1226(c) was originally intended to address "a limited class of deportable aliens—including those convicted of an aggravated felony." *Demore*, 538 U.S. at 518. "The categories of predicates for mandatory detention identified in subparagraphs (A)–(D) generally involve the commission of crimes." *Nielsen v.*

*Preap*, 586 U.S. 392, 398 (2019). Where a noncitizen falls within any of the categories outlined in 8 U.S.C. § 1226(c), DHS does not have discretion to release the noncitizen on bond, as it does for those detained under subsection 1226(a). *See id.* § 1226(c)(1) ("The Attorney General *shall* take into custody any alien who . . .") (emphasis added); *Nielsen*, 586 U.S. at 398 ("Congress mandated that aliens who were thought to pose a heightened risk be arrested and detained without a chance to apply for release on bond or parole").

Section 1226(c) contains several subsections delineating the different categories of noncitizens that are subject to mandatory detention during the pendency of their removal or withholding proceedings. Subsection (A) covers those who are "inadmissible" by reason of having "committed any offense covered in section 1182(a)(2) of this title," which includes crimes "involving moral turpitude" or "controlled substance" violations. 8 U.S.C. § 1226(c)(1)(A). Subsection (B) covers those who are "deportable" "by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title," which include aggravated felony, controlled substance convictions, certain firearm offenses, and other (defined) miscellaneous crimes. *Id.* § 1226(c)(1)(B).[6] Subsection (C) mandates detention for those noncitizens "deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence [sic] to a term of imprisonment for at least 1 year." *Id.* § 1226(c)(1)(C). The offenses described in the cited subsection of Section 1227 are "crimes of moral turpitude committed within five years . . . after the date of

---

[6] "The Government can remove aliens on different grounds depending on whether they have been formally admitted to the country. It can remove aliens applying for admission if they are 'inadmissible,' and it can remove already admitted aliens if they are 'deportable.'" *Blanche v. Lau*, 2026 WL 1791339, at *3 (U.S. June 23, 2026) (quoting *Campos-Chaves v. Garland*, 602 U.S. 447, 451 (2024)).

admission." *Id.* § 1227(a)(2)(A)(i).[7]  Subsection (D), as applicable here, does not require a crime

at all.  It covers noncitizens who are inadmissible or deportable for a number of reasons

including by having "engaged in terrorist activity," being a member of a terrorist organization,

endorsing or espousing terrorist activity or persuading others to do the same, supporting a

terrorist organization, or being the spouse or child of a person inadmissible for such activity

within the prior five years.  *Id.* § 1226(c)(1)(D).  Finally, Subsection E codifies the Laken-Riley

Act.  *See* Laken Reily Act, Pub. L. No. 119-1, 139 State. 3 (2025).  It mandates detention of

those who are inadmissible because they entered the country illegally *and* who have been

charged with, arrested for, convicted of, or admit to having committed acts that constitute the

essential elements of burglary, theft, larceny, shoplifting, assault of a law enforcement officer, or

any crime that results in death or serious bodily injury to another person.  *Id.* § 1226(c)(1)(E).

Each of the enumerated grounds apply "without regard to whether the [noncitizen] is released on

parole, supervised release, or probation, and without regard to whether the [noncitizen] may be

arrested or imprisoned again for the same offense."  *Id.* § 1226(c)(1).

    The statute, and Subsection D in particular, is broad.  Section 1226(c)(1)(D) references

terrorist activity, which as defined in 8 U.S.C. § 1182(a)(3)(B)(iii), includes certain conduct that

colloquially may not ordinarily be understood to be terrorist.  It includes "any activity which is

unlawful under the laws of the place where it is committed (or which, if it had been committed in

the United States, would be unlawful under the laws of the United States or any State," and

which involves (I) the "highjacking or sabotage of any conveyance," (II) seizing, detaining, or

threatening to kill, injure, or detain someone to compel a third person to abstain from doing an

---

[7] Moral turpitude is not defined in the INA.  The Second Circuit has held that "corrupt scienter is the touchstone" of the inquiry.  *Michel v. I.N.S.*, 206 F.3d 253, 263 (2d Cir. 2000) (citation omitted).

act, (III) a violent attack on an internationally protected person, (IV) an assassination, (V) the use of any biological/chemical agent or other dangerous device with intent to endanger, directly or indirectly, the safety of one or more individuals, and (VI) a threat, attempt, or conspiracy to do any of the forgoing.  8 U.S.C. § 1182(a)(3)(B)(iii).

That same section of the statute defines "engage in terrorist activity" broadly to include (I) commission of a terrorist activity under circumstances indicating an intent to cause death or serious bodily injury, (II) to prepare or plan a terrorist activity, (III) to gather information for a terrorist activity, (IV) to solicit things of value for a terrorist activity or organization, (V) to solicit an individual to engage in terrorist activity, or (VI) the commission of "an act that the actor knows, or reasonably should know, affords material support" for a terrorist activity or organization.  *Id.* § 1182(a)(3)(B)(iv)(VI).  Section 1227(a)(4)(B), the other statute referenced in the relevant provision of Section 1226(c), deems deportable "[a]ny alien who is described in subparagraph (B) or (F) of section 1182(a)(3) of this title," *id.* § 1227(a)(4)(B).  Section 1182(a)(3)(B) is that described above, and subsection (F) includes any noncitizen who "has been associated with a terrorist organization and intends while in the United States to engage solely, principally, or incidentally in activities that could endanger the welfare, safety, or security of the United States."  *Id.* § 1182(a)(3)(F).

Accordingly, a noncitizen that falls within those categories as delineated is subject to the mandatory detention bar in Section 1226(c) without any consideration of risk of flight or danger to the community.

### C.    The Material Support Bar

The characterization of a noncitizen as having "engaged in a terrorist activity" confers extraordinary power on the Executive with dramatic consequences.  A person who is considered to have engaged in such activity is denied bond and subject to mandatory detention.  As noted,

13

she is also denied the protections of the federal statutes providing for asylum and withholding of

removal.  *See* 8 U.S.C. §§ 1182(a)(3)(B)(i)(I), 1158(b)(2)(A)(v), 1227(a)(4)(B).  What is known

as the material support bar is "as a general matter, a sweeping statutory provision" and it "bars

many noncitizens from receiving asylum or withholding of removal in the United States—even

though, in almost any other context, those citizens would not be seen to have culpably supported

a terrorist organization."  *Sufiyan v. Blanche*, 177 F.4th 111, 118 (2d Cir. 2026

The INA "defines 'engaging in a terrorist activity' to include providing 'material support'

to terrorist organizations or individuals."  *Ay v. Holder*, 743 F.3d 317, 319 (2d Cir. 2014).  Thus,

a noncitizen is subject to mandatory detention if (1) she has provided any financial support to (2)

an organization that is considered to be a "terrorist organization."  But the determination of

whether a noncitizen is subject to the material support bar such that they are subject to

mandatory detention under Section 1226(c) rather than discretionary detention under Section

1226(a) is left entirely to the individual IJ presiding over the noncitizen's case.  *See Sufiyan*, 177

F.4th at 119 (citing 8 U.S.C. §§ 1158(b)(1)(A), (b)(2)(A)(v); *Hernandez v. Sessions*, 884 F.3d

107, 112 (2d Cir. 2018)).  The IJ is granted the authority to determine both whether the

noncitizen provided support that was in fact "material," and whether such support was provided

to a "terrorist" group.

On the question of what constitutes a terrorist group, the INA provides for three different

tiers of terrorist organizations.  The government designates organizations as Tier I and Tier II

terrorist organizations in the text of the INA itself or by publication in the Federal Register.  *See*

8 U.S.C. § 1182(a)(3)(B)(vi)(I), (II).  A noncitizen who provides material support to a Tier I or

Tier II terrorist organization is inadmissible, is subject to mandatory detention, and is ineligible

for asylum or CAT relief, whether he knew that he was supporting a terrorist organization or not.

8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(cc).  An IJ may also find that any "group of two or more individuals, whether organized or not, which engaged in, or has a subgroup which engaged in" the activities defined as terrorist activity is a Tier III terrorist organization.  *Id.* § 1182(a)(3)(B)(vi)(III).  That group of two individuals could be foreign or domestic.

On the question of materiality, as the BIA has interpreted the statute (and thus as the IJ must apply it), the material support bar in the INA contains "no exception . . . for *de minimis* support provided to a terrorist organization."  *Sufiyan*, 177 F.4th at 118 (citing *Matter of A-C-M*, 27 I.&N. Dec. 303, 307 (BIA 2018)); *see also Doleck Nepali v. Barr*, 828 F. App'x 14, 18 (2d Cir. 2020) (finding the supply of "a minimal amount of food" to a terrorist organization to be material support"); *Hernandez*, 884 F.3d at 109–11 (similar).  A noncitizen is subject to the bar if he or she gave any support to such an organization even if the noncitizen did not know of the organization's activities or designation.  A noncitizen who provides material support to a Tier III terrorist organization remains admissible only if he "can demonstrate by clear and convincing evidence that [he] did not know, and should not reasonably have known, that the organization was a terrorist organization."  *Id.* § 1182(a)(3)(B)(iv)(VI)(dd).  The Government has no burden.

The definition of terrorist activity and engaging in terrorist activity in 8 U.S.C. § 1182(b)(3) defines the scope of both those noncitizens subject to mandatory detention under Section 1226(c)(1)(D) and those who are ineligible for asylum and withholding of removal under Section 1158(b)(2)(A)(v).  Those proceedings are distinct.  *See Garcia v. Decker*, 448 F. Supp. 3d 297, 302 & n.3 (S.D.N.Y. 2020) (explaining that "the bond hearing proceeds independently of the removal proceedings") (citing 8 C.F.R. § 1003.19(d)); *D.C. v. Noem*, 2026 WL 787895, at *9 (S.D.N.Y. Mar. 20, 2026) ("a merits hearing is 'separate and apart from' a bond determination.") (quoting *Amides-Galdamez v. Barr*, 810 F. App'x 52, 53 (2d Cir. 2020) (summary order)).  In

removal proceedings, application of the material support bar renders the noncitizen ineligible for asylum or withholding relief. *See* 8 U.S.C. § 1182(b)(2)(A)(v). And in the context of a bond hearing a determination by the IJ that the material support bar applies results in mandatory detention pending the resolution of any merits proceedings. *See id.* § 1226(c)(1)(D). Where a noncitizen is not contesting removability and seeks relief only on the grounds of withholding of removal, then, DHS can argue that the material support bar should apply to permit the noncitizen to be detained indefinitely pending the outcome of that case. And even where the noncitizen does not seek relief from detention, the IJ will consider material support in deciding whether to grant asylum or relief from removal and will deny such relief if the material support bar applies.

The statute provides a noncitizen an opportunity to seek an exemption from the harsh effect of the material support decree. Under the INA, the "Secretary of Homeland Security, after consultation with the Secretary of State and the Attorney General, may determine in such Secretary's sole unreviewable discretion" that the terrorism bar "shall not apply with respect to an alien within the scope of" that section. 8 U.S.C. § 1182(d)(3)(B). But the opportunity to seek an exemption is severely constrained. First, it is available in full only to noncitizens who are subject to the bar on the basis of their affiliation with a Tier III organization. It does not apply to noncitizens found to be affiliated in many ways with Tier I or Tier II organizations. *Id.* (noting that "no such waiver may extended to an alien who is a member or representative of, has voluntarily and knowingly engaged or endorsed or espoused or persuaded others to endorse or espouse or support terrorist activity on behalf of, or has voluntarily and knowingly received military-type training from a terrorist organization that is described in subclause (I) or (II) of subsection (a)(3)(B)(vi)").[8] More important for this case, as it has been applied by the

---

[8] The waiver also exempts from its scope (1) a noncitizen that a "consular officer, the Attorney

16

government, the noncitizen exemption process for the material support bar, 8 U.S.C.

§ 1182(d)(3)(B), is available only if the "BIA has determined that the applicant is otherwise

eligible for relief from removal and has issued a final order of removal based on the material

support bar." *Sufiyan*, 177 F.4th at 119 (citing Fact Sheet: Department of Homeland Security

Implements Exemption Authority for Certain Terrorist-Related Inadmissibility Grounds for

Cases with Administratively Final Orders of Removal at 1 (U.S.C.I.S. Oct. 23, 2008)); *see also*

72 Fed. Reg. 26138-02 ("Exercise of Authority Under Section 212(d)(3)(B)(i) of the

Immigration and Nationality Act.").

If the noncitizen is ordered removed on a basis other than the material support bar, *e.g.*, if

the noncitizen is ordered removed for overstaying a visa, or is ultimately denied asylum because

they are not a part of a particular protected social group, there is no opportunity to challenge the

material support bar. A noncitizen who falls in that category can be detained indefinitely under

Section 1226(c) without any opportunity to challenge the bar if an IJ determines he or she

provided any support to an organization, defined as two or more persons, considered to be a Tier

III organization even if such support was *de minimis* and even if provided unknowingly

(provided that the noncitizen does not prove that he or she should not have known that the group

engaged in the defined terrorist activities). Put more simply, under the statutory scheme as

currently implemented by DHS, in many cases the IJ has conclusive and complete discretion to

determine himself whether any group of two persons, domestic or foreign, constitutes a terrorist

organization, and whether a noncitizen's provision of any support, however *de minimis*, is

---

General, or the Secretary of Homeland Security knows, or has reasonable ground to believe, is engaged in or likely to engage after entry in any terrorist activity"; (2) "a group that has engaged in terrorist activity against the United States or another democratic country or that has purposefully engaged in a pattern or practice of terrorist activities that is directed at civilians." *Id.*

material.  And, if the IJ makes that determination in the course of a bond determination, and if the IJ does not (or chooses not to) rely on the material support bar as a basis for removal, there would be no opportunity to seek an exemption from USCIS.

As discussed further below, that describes Petitioner's circumstance.  He was ordered removed for overstaying his visa and denied asylum on the basis that he was not a part of a particular social group, but ordered mandatorily detained on the basis that he provided "material support" to an organization that the IJ found to be a terrorist organization.  He was so found even though he claimed that the amounts were *de minimis* and were extorted and paid under coercion.  The organization that the IJ found to be a terrorist organization was MS-13.  But it could have been any organization that the Government proved to the satisfaction of an IJ was a terrorist organization, under the broad definition of terrorist organization provided by federal statute.

D.    The Due Process Rights of Noncitizens in Immigration Detention

The Supreme Court and Second Circuit have, over the course of the past decade, set certain guardrails around DHS's exercise of its civil immigration detention authorities.  It is well established that "[d]etention during removal proceedings is a constitutionally valid aspect of the deportation process."  *Velasco Lopez*, 978 F.3d at 848 (citing *Demore*, 538 U.S. at 523).  There remain, however, "'important constitutional limitations' on that power's exercise."  *Id.* (quoting *Zadvydas v. Davis*, 533 U.S. 678, 695 (2001)); *see Reno v. Flores*, 507 U.S. 292, 306 (1993).  "[T]he Fifth Amendment entitles all 'persons' to due process of law," and "covers noncitizens, whether their presence here is lawful, unlawful, temporary, or permanent."  *Id.* at 850 (quoting U.S. Const. amend. V).  As the Supreme Court recognized in *Zadvydas*, "[a] statute permitting indefinite detention of an alien would raise a serious constitutional problem."  533 U.S. at 690.  In *Demore*, the Supreme Court upheld the facial constitutionality of mandatory detention under Section 1226(c) but emphasized that it did so recognizing the "apparent brevity of detentions

18

pending removal." *Black v. Decker*, 103 F.4th 133, 144 (2d Cir. 2024) (citing *Demore*, 528 U.S. at 527–31). The Court there cited data presented by the Government that for 85% of noncitizens detained under Section 1226(c), their "removal proceedings are completed in an average time of 47 days and a median of 30 days," and that "[i]n the remaining 15% of cases, in which the alien appeals the decision . . . appeal takes an average of four months, with a median time that is slightly shorter." 528 U.S. at 528.[9] Justice Kennedy cast the deciding fifth vote to form the majority in *Demore*. In his separate concurrence, he wrote that "since the Due Process Clause prohibits arbitrary deprivations of liberty, a lawful permanent resident alien . . . could be entitled to an individualized determination as to his risk of flight and dangerousness if the continued detention became unreasonable or unjustified." *Id.* at 532 (citing *Zadvyadas*, 533 U.S. at 684–86).

### 1.    *Velasco Lopez v. Decker*

In *Velasco Lopez*, the Second Circuit drew on the Supreme Court's opinions in *Demore* and *Zadvydas* in addressing whether prolonged detention under Section 1226(a) violated the due process clause. 978 F.3d at 846–47. There, three and a half months after the petitioner's initial detention, he was given an initial bond hearing at which he had the burden of proving that he was

---

[9] The Second Circuit noted in *Black* that the representations made by the Government to the Supreme Court in *Demore* may have been inaccurate, and that the reality is that detention in a removal proceeding "normally lasts twice as long as the Government then said it did." 103 F.4th at 144 n.14 (quoting *Jennings*, 583 U.S. at 343 (Breyer, J. dissenting)). *See also id.* (citing Letter from Ian Heath Gershengorn, Acting Solicitor Gen., to Scott Harris, Clerk, Supreme Ct. of the U.S. at 1 (letter sent "to correct and clarify statements the government made in its submissions in *Demore v. Kim* . . . which the Court relied on in its opinion."). The expected length of detention may not have been the only mistake in the Supreme Court's decision in *Demore*. Recent scholarship has called into question the accuracy of the Court's statement that there is a "longstanding view" that noncitizens in removal proceedings can be detained indefinitely without any consideration of danger or risk of flight. *See* Lindsay Nash, *Resurrecting Immigration Release*, 135 Yale L.J. 1533, 1533 (2026) (arguing that "the opportunity for release was virtually always part of deportation's early pre-trial detention scheme," and that "any pretrial detention deemed constitutionally valid during that period came with the possibility of release.").

neither a flight risk nor dangerous to the community. *Id.* at 847, 849. After another five months he was granted another bond hearing, at which again he had the burden of proof. *Id.* at 847. Finally, after fourteen months in detention, he sought and was granted habeas relief in federal district court. *Id.* at 847–48.

After affirming that "the Fifth Amendment entitles noncitizens to due process of law," *id.* at 850, the Circuit applied the "three factors balancing test as provided in *Mathews v. Eldridge*, 424 U.S. 319 (1976)" to determine whether the petitioner's "ongoing incarceration posed due process concerns at the time of his habeas filings and whether additional procedural protections became necessary." *Id.* at 851. Under that test, courts must consider (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335. Following evaluation of those factors, the *Mathews* test "then contemplates a judicious balancing of these concerns, through an analysis of 'the risk of an erroneous deprivation' of the private interest if the process were reduced and the 'probable value, if any, of additional or substitute procedural safeguards.'" *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004) (quoting *Mathews*, 424 U.S. at 335).

The Second Circuit then walked through each of the factors as they applied to the petitioner there. First, "the private interest affected by the official action is the most significant liberty interest there is—the interest in being free from imprisonment." *Velasco Lopez*, 978 F.3d at 851. Second, the Circuit determined that the procedures used "seriously impacted his ability to secure bail," because he was unable to access important information and had the burden to

20

disprove the Government's contention that he was a danger and flight risk. *Id.* at 853. Finally, the Circuit acknowledged the Government's interest in "(1) ensuring that noncitizens do not abscond and (2) ensuring that they do not commit crimes," but concluded that the Government "has not articulated an interest in the prolonged detention of noncitizens who are neither dangerous nor a risk of flight." *Id.* at 854. "To the contrary, shifting the burden of proof to the Government to justify continued detention promotes the Government's interest—one we believe to be paramount—in minimizing the enormous impact of incarceration in cases where it serves no purpose." *Id.* Finding that the *Mathews* factors weighed in favor of the petitioner, the Second Circuit affirmed in *Velasco Lopez* the district court's grant of a new bond hearing with the burden of proof on the government to show that detention was necessary by a "clear and convincing standard." 978 F.3d at 855.

### 2. *Black v. Decker*

In *Black*, the Circuit extended its holding in *Velasquez Lopez* to Section 1226(c). Two petitioners were before the Court in *Black*. Both were mandatorily detained pursuant to 8 U.S.C. § 1226(c), on the basis that they had prior criminal history. 103 F.4th at 139. One petitioner, Black, filed a habeas petition in federal district court after seven months of detention without a bond hearing, and was granted habeas relief in the form of a new bond hearing where the government bore the burden of proving flight risk and danger by clear and convincing evidence. *Id.* The other, G.M., filed a habeas petition after seven months of detention, which was denied. *Id.* at 140. He was eventually released for unrelated reasons after twenty-one months in detention, during which he never received a bond hearing. *Id.*

Although detention under Section 1226(c) is mandatory rather than discretionary, the Court concluded that "due process challenges to prolonged detention under section 1226(c) should also be reviewed under *Mathews*." *Id.* at 147. It did so in the face of the Government's

21

argument that *Demore* foreclosed the application of *Mathews*, which the court rejected by noting that although the Supreme Court "upheld the government's authority under section 1226(c) to detain noncitizens without an initial bond hearing 'for the brief period necessary for their removal proceedings,' . . . [i]t said nothing about whether due process may *eventually* require a hearing." *Id.* at 149 (quoting *Demore*, 538 U.S. at 513) (emphasis in original). The framework allows courts "to assess, case by case, whether an individuals prolonged . . . detention violates due process." *Id.* at 150. Its application yields no "bright-line constitutional rule," and attaches no "presumption of reasonableness or unreasonableness of any duration of detention." *Id.* (internal citation omitted).

As in *Velasco Lopez*, the Second Circuit in *Black* then applied the *Mathews* factors. Again, on the first factor, the Court found that the private interest in "being free from imprisonment" weighed in favor of the petitioners. *Id.* at 151 (quoting *Velasco Lopez*, 978 F.3d at 851). This was true even though the "detentions in some sense were the result of criminal adjudication, since a conviction was the premise for applying section 1226(c)," because "each has served his entire sentence," and "their detentions did not arise from new or unpunished conduct." *Id.* (cleaned up). On the second factor, the Circuit noted that the "procedures used for section 1226(c) detainees are very few," and "include no mechanism for a detainee's release, nor for individualized review of the need for detention." *Id.* at 152. It contrasted that to detention under 1226(a) as discussed in *Velasco Lopez*, where the petitioner "received two bond hearings" and the court still concluded that "the procedures underpinning his lengthy incarceration markedly increased the risk of error." *Id.* (quoting *Velasco Lopez*, 978 F.3d at 852). Therefore, "almost *any* additional procedural safeguards at some point in the detention would add value," the "most obvious" of which "would be an individualized bond hearing at which an IJ can

22

consider the noncitizen's dangerousness and risk of flight." *Id.* at 153. Finally, the Circuit affirmed its earlier conclusion that the Government has no interest "in the prolonged detention of noncitizens who are neither dangerous nor a risk of flight." *Id.* at 154 (quoting *Velasco Lopez*, 978 F.3d at 854). While recognizing that "the government's legitimate interested justif[ied] a relatively short-term deprivation of liberty," the court held that "the balance of interests shifts as the noncitizen's detention [becomes] prolonged without any particularized assessment of need." *Id.* Weighing those factors, the circuit affirmed that the grant of a bond hearing at which the government must show "by clear and convincing evidence, the need for Black's continued detention" was the appropriate relief. *Id.* at 159.

### E.    J.R.U.'s Immigration Proceedings

With the statutory and regulatory framework in mind, it is necessary to return to the facts of Petitioner's case.

J.R.U. was initially detained in January 2025 pursuant to Section 1226(a), and given a bond hearing at which he bore the burden of proof to show that he was not a danger to the community or a flight risk. Pet. ¶ 34. In support of his request for relief, he submitted a personal declaration, letters of support from community members, friends, a church leader, and his employer, as well as a copy of his application for relief from removal and related documentation and evidence of his acquittals in Salvadoran court. *Id.* ¶ 35. He then submitted supplemental evidence regarding Salvadoran authorities' violations of the double jeopardy provision contained in the El Salvador constitution. *Id.* At that hearing, DHS argued that J.R.U. was ineligible for bond pursuant to the material support bar, citing the payments that he made to MS-13 in El Salvador. *Id.* ¶ 36. J.R.U. testified at the hearing on direct and cross and the IJ found his testimony to be credible. *Id.* ¶ 37.

On May 14, 2025, the IJ granted J.R.U. bond in the amount of $35,000. Pet. ¶ 39; Dkt. No. 19-1. After DHS submitted an appeal of that order, the IJ issued a written bond memorandum laying out his analysis, in which he recognized that although there "is no dispute that [J.R.U.] provided weekly extortion payments to both the MS-13 and Barrio 18 gangs between the years of 2002 and 2015," DHS "has not presented any evidence, nor does the record contain any evidence, to indicate that the MS-13 qualified as a Tier III terrorist organization when the Respondent was making" those payments. Dkt. No. 19-4 at 5. There was "no country condition evidence discussing MS-13 activities during that time period," and although MS-13 has since been labeled a Tier I organization, that 2025 designation "has no bearing on its designation, or the activities or acts carried out by the groups or its members, between the years of 2002-2015, as relevant in this case." *Id.* at 6. Therefore, the IJ found that "based on the scant record evidence before the Court," the material support bar did not apply. *Id.*

Having determined that Petitioner was not subject to the material support bar, the IJ found that Petitioner should be released on bond. The IJ found that Petitioner was not a danger to the community. J.R.U. "has resided in the United States with no law enforcement history since his arrival from El Salvador," he "has paid taxes for approximately the past four or five years," and is "described as a hardworking family man" who attends church and is further described as a "pillar of strength for his family and his community." *Id.* at 7. The IJ rejected the Government's argument that J.R.U.'s "arrest history in El Salvador and his failure to disclose the arrest and his address on his 2015 visa application" showed danger to the community. The judge did "not find any merit to the Department's arguments that the charges against him . . . implicate him as a gang member or a dangerous person," and determined that the errors in his visa application did not show "that he is a danger to the community today." *Id.* at 7. On flight risk,

24

the IJ considered J.R.U.'s "substantial ties to the country," but also "factors that raise some concerns," including the fact that he was in removal proceedings which "could be an impetus for his failure to appear for a future hearing." *Id.* On that basis, and considering the financial information available, the IJ set bond at $35,000. *Id.* at 9.

J.R.U. was not released from custody because DHS immediately appealed that decision, and invoked an automatic stay. Pet. ¶ 47 (citing 8 C.F.R. § 1003.13(i)(2)). Before the BIA decided Petitioner's appeal, the same IJ rejected Petitioner's application for asylum and withholding of removal on the conclusion that he was ineligible for that relief on the basis that he had provided material support to MS-13. Dkt. No. 19-3. In that order, the IJ relied on "news articles from reputable news sources and NGO reports detailing the violent acts committed by the MS-13 in its quest to overthrow the El Salvadoran government." *Id.* at 10. The IJ also cited J.R.U.'s testimony that "MS-13 murders indiscriminately, and in a particularly brutal manner." *Id.* at 11. The IJ then found that the extortion fees paid by J.R.U. to MS-13 between 2002 and 2015 constituted material support, as those "funds . . . certainly aided MS-13 in continuing their mission." *Id.* at 12 (cleaned up). Although the IJ acknowledged that J.R.U. made the payments only "under threat of harm," and "in order to continue working and earning a livelihood," the IJ rejected the argument that Petitioner was eligible for asylum and CAT relief because "the INA does not contain a duress exception for material support." *Id.* at 13. The IJ further found Petitioner had not shown "by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization at the time he provided material support." *Id.* (internal citation omitted).[10]

---

[10] The IJ also found, in the alternative, that J.R.U. was ineligible for asylum because he could not demonstrate persecution on account of a protected ground, *id.* at 13–20, ineligible for withholding of removal for that same reason, *id.* at 20, and that he was not entitled to CAT relief

On the basis of the IJ's asylum and withholding order, the BIA vacated the IJ's bond order. Dkt. No. 19-5. It held that the IJ "may use a ruling on the underlying merits of the removal proceeding as the basis for his finding of jurisdiction over the respondent's bond claim," and thus remanded the record to the IJ to consider the impact of the decision in the asylum proceedings on Petitioner's application for relief. *Id.* at 3. It also instructed the IJ to consider, on remand, "evidence in the record regarding the respondent's application for a visa and his failure to comply with the terms of his admission as it related to flight risk." *Id.* at 2.

On remand, the IJ did as instructed and determined that the material support bar applied in the context of Section 1226 and denied the application for bond.[11] The IJ relied "on its removal decision" and therefore determined that J.R.U. did, on the same basis articulated there, "provide material support to a Tier III terrorist organization and is thus properly included in the mandatory detention category." Dkt. No. 19-7 at 3. The IJ additionally relied on "an evidentiary packet containing identical country conditions reports as the one submitted at [J.R.U.'s] merits hearing," and thus found that "this evidence establishes that MS-13 was a Tier III terrorist group during the relevant period." *Id.* at 4. The IJ also found, as before, that the extortion fees counted as material support "regardless of whether it was intended to aid the organization." *Id.* As before, he found that J.R.U. had not met his burden of proving that he did not know and could

---

because there was "insufficient evidence' that he would be tortured by either MS-13 or the Salvadoran government upon his return, *id.* at 20–28.

[11] The IJ originally denied bond at the hearing after remand because although he had not yet "come to a conclusion on the issue of mandatory detention," he was "still not going to grant bond because he's a very high flight risk." Dkt. No. 19-14 at 51. Rather than wait to make any determination until he reached a conclusion on material support, the IJ "figured it's best to just issue the order now and get the parties moving on the issue," and explained that if either party appealed the bond determination, he would then "do a bond memo" reaching a conclusion on whether J.R.U. is subject to mandatory detention. *Id.* Once an appeal was taken, the IJ did issue a written order finding the Petitioner to be subject to the material support bar.

not have reasonably known that MS-13 was a terrorist organization because his own testimony established that he feared them and that they committed crimes. *Id.* at 5.[12]

On November 18, 2025, the BIA affirmed the IJ's removal order on the grounds that he was not a member of a particular social group, and was thus ineligible for asylum. Dkt. No. 19-2. The BIA specifically noted that it did not reach "the applicability of the material support bar." *Id.* J.R.U. petitioned the Second Circuit for review of the BIA's decision on November 20, 2025. Pet. ¶ 33.

## II.    J.R.U.'s Due Process Rights Were Violated

In his petition for the writ of habeas corpus, Petitioner presents several different arguments. His arguments include (1) that his due process rights were independently violated by the IJ's amendment of his oral decision denying bond on the grounds that he "failed to meet this burden" by explaining that his detention was mandatory under Section 1226(c); (2) that a reading of the material support bar that does not exempt *de minimis* support violated Petitioner's due process rights; (3) that his inability to apply for a waiver of the application of the material support bar in the bond proceedings independently resulted in a violation of his due process rights; (4) that the labeling of MS-13 as a Tier III terrorist organization was arbitrary and capricious and ultra vires; (5) that his due process rights were violated by the automatic stay provision;[13] (6) that the allocation of the burden on him at the bond proceeding violated the

---

[12] In the alternative, the IJ found, with the burden on J.R.U., that he was not entitled to discretionary release under Section 1226(a) because he was a flight risk. The IJ made that finding on the basis that his "manner of entry into the country was marred by deception and failure to abide by the terms of his visa," *id.* at 7, and because he "now had an order of removal entered against him, which gives him no incentive to appear at any future court date," *id.* at 8. The IJ did not discuss and made no finding of dangerousness, instead reiterating that J.R.U. has "significant community and family ties," that he has "steady employment," and is "committed to his church." *Id.* at 7.

[13] The parties agree that the Petitioner's claim based on his challenge to the automatic stay provision is moot.

APA; (7) that the IJ's analysis on risk of flight was not constitutionally sound; and (8) that in any event, his detention has become unreasonably prolonged such that due process requires a constitutionally adequate bond hearing at which the Government bears the burden of proof by clear and convincing evidence.  Pet. ¶¶ 80–166.

Petitioner argues that the Court has the authority under 28 U.S.C. § 2241 to determine whether the application of the material support bar was arbitrary and capricious or contrary to law under the APA.  The habeas statute is clear that the writ should be granted where a petitioner is "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2241(c)(3).  The APA, which states that a court should "hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), is a law of the United States.  There also is "'well-settled' and 'strong presumption' … that executive determinations generally are subject to judicial review."  *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 229 (2020) (quoting *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479, 496, 498 (1991)).  Surely, if Petitioner's detention rested upon a wholly arbitrary and capricious determination that a particular assemblage of persons, foreign or domestic, was a terrorist organization, that determination would not be immune from judicial review.  If the determination was arbitrary and capricious or contrary to law, any deprivation of liberty resulting therefrom would be "in violation" of that law.  *See Orellana v. Francis*, 2025 WL 2822640, at *5 (E.D.N.Y. Oct. 3, 2025) (finding that habeas is an "attack by a person in custody upon the legality of that custody," which "includes an attack on the legality of custody based on violations of the APA.").  A contrary view would be breathtaking and lead to unfathomable results.  Petitioner is accused of providing support to MS-13.  But the Government's argument would apply to any group of two or more persons no matter

28

how benign its activities or how arbitrary and capricious the Government's contrary conclusion.[14]

Ultimately, the Court need not review the IJ's determination that the material support bar applied under the APA because, assuming Petitioner was properly detained under Section 1226(c), he still is entitled to relief under the framework set out by the Second Circuit in *Black v. Decker*.[15] It is undisputed that Petitioner has spent more than 16 months in detention. Pet. ¶ 4. That is significantly more time than the petitioner in *Velasco Lopez* spent "incarcerated in the Orange County Correctional Facility . . . alongside criminally charged defendants and those serving criminal sentences." *Velasco Lopez*, 978 F.3d at 851 (citing *Charles v. Orange County*, 925 F.3d 73, 78 n.3 (2d Cir. 2019)). It is also significantly longer than the seven months of detention at issue for one of the petitioners in *Black*. 103 F.4th at 137. The Government has offered no justification for why Petitioner's detention has had to be so long. Accordingly, the

---

[14] Respondent has provided no credible reason a violation of the APA could not result in relief under habeas. First, Respondent argues that the Supreme Court in *Trump v. J.G.G.* held as much by stating that claims under statutes including the APA that "necessarily imply the invalidity of their confinement" are "within the core of the writ of habeas corpus and thus must be brought in habeas" in the district of confinement. 604 U.S. 670, 671 (2025) (cleaned up). That is, in fact, exactly what the Petitioner here has done; unlike in *J.G.G.*, the petitioner seeks a finding that his confinement is invalid through habeas, not through a standalone APA cause of action. Second, 5 U.S.C. § 704, which states that claims under the APA are not available where there was another "adequate remedy in a court," does not preclude relief in habeas. "Congress intended by that provision simply to avoid duplicating previously established special statutory procedures for review of agency actions." *Darby v. Cisneros*, 509 U.S. 137, 146 (1993). Where, as here, the respondent has "identified no such procedures by which plaintiffs could have pursued their claims outside the APA," that section of the statute poses no bar to relief. *Garro Pinchi v. Noem*, 813 F. Supp. 3d 973, 1026 (N.D. Cal. 2025). Finally, Respondents' citations for the proposition that the Court lacks jurisdiction to consider a challenge under the APA to the material support bar are inapposite. In *Delgado v. Quarantillo*, the Second Circuit found that the district court had no jurisdiction where its ruling would "render" the order of removal "invalid." 643 F.3d 52, 55 (2d Cir. 2011). Respondents do not explain how a ruling in the context of J.R.U.'s bond hearing could have any effect whatsoever on Petitioner's order of removability.

[15] Petitioner has preserved all of his other arguments for release.

29

Court turns to the *Mathews v. Eldridge* framework to determine if J.R.U. is due any more process than what was afforded him in his bond proceedings and is entitled to release.

### A.    The Private Interests Affected by the Official Action

The first factor the Court must consider under *Mathews* is the private interest of the parties. "Here, the private interest affected by the official action is the most significant liberty interest there is—the interest in being free from imprisonment." *Velasco Lopez*, 978 F.3d at 851 (citing *Hamdi*, 542 U.S. at 529). "We have always been careful not to minimize the importance and fundamental nature of the individual's right to liberty." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992); *see also United States v. Salerno*, 481 U.S. 739, 755 (1987) ("In our society liberty is the norm, and detention . . . is the carefully limited exception."); *Garcia v. Decker*, 448 F. Supp. 3d 297, 301 (S.D.N.Y. 2020) ("[T]he Supreme Court has repeatedly reaffirmed that freedom from civil detention is a core tenet of constitutional due process."). This liberty interest "remains fundamental notwithstanding" that Petitioner was found by the IJ to have provided material support to MS-13 in the form of involuntary extortion payments. *See O.F.C. v. Almodovar*, 2026 WL 74262, at *9 (S.D.N.Y. Jan. 9, 2026).

"The length of Petitioner's present detention and his conditions of confinement further 'heighten his [liberty] interest.'" *Id.* (quoting *J.M.P. v. Arteta*, 2025 WL 2984913, at *16 (S.D.N.Y. Oct. 23, 2025)); *see Rashid v. Trump*, 2025 WL 3210955, at *9 (D. Vt. Oct. 27, 2025) (explaining that "[an] individual's liberty interest increases over time"); *D.C. v. Noem*, 2026 WL 787895, at *7 (S.D.N.Y. Mar. 20, 2026) (explaining that "lower court decisions in this Circuit – before and after *Black*—have underscored the heightened severity of detention exceeding six months, and in cases under § 1226(c), have been more likely to find a due process violation where detention without a bond hearing has been extended beyond six months.") (citing cases).

30

This deprivation of Petitioner's liberty has been, "on any calculus, substantial." *Velasco Lopez*, 978 F.3d at 851.

This is confirmed by the conditions of that confinement, which "heighten his interest in freedom from confinement." *J.P.M. v. Arteta*, 807 F. Supp. 3d 265, 290 (S.D.N.Y. 2025); *Velasco Lopez*, 978 F.3d at 852 (noting that a noncitizen was incarcerated in conditions identical to those imposed on criminal defendants convicted of "violent felonies and other serious crimes"). In his Petition, J.R.U. details that the facility in which he is held "has been the subject of complaints for its treatment of ICE detainees, including allegations of medical neglect, lack of access to unspoiled food, and abuse, harassment, and retaliation by jail personnel." Pet. ¶ 110 (citing *J.P.M.*, 807 F. Supp. 3d at 290 n.22). Petitioner's liberty interests "come into full relief when considering" too his "specific circumstances." *O.F.C.*, 2026 WL 74262, at *10. J.R.U. has three children in the United States, and until his detention was employed as a mason at a construction company since his arrival in the country almost a decade ago. Pet. ¶ 45; *see D.C.*, 2026 WL 787895, at *8 (considering that "as a result of D.C.'s detention, he has been separated from his three daughters"); *Black*, 103 F.4th at 151 (noting that petitioner "is a father to three young children" in evaluating his private interests).

Additionally, as in *Velasco Lopez*, "[t]here is no administrative mechanism by which [J.R.U.] could have challenged his detention on the ground that it reached an unreasonable length." 978 F.3d at 852. Under 1226(c), detention is mandatory, without opportunity for release on bond. 8 U.S.C. § 1226(c). The lack of a procedural mechanism to review Petitioner's detention is particularly pronounced considering the basis for his detention, and the fact (discussed at length *supra*) that he is ineligible for even a discretionary waiver of the material support bar because his order of removal is not predicated on the material support bar. Pet. ¶ 90.

The order of removal is instead predicated on the BIA's determination that there was a "lack of nexus" between J.R.U.'s asylum application "to a protected ground." Dkt. No. 19-8 at 2. The BIA expressly declined to reach "other aspects of the Immigration Judge's decision on those claims." *Id.* In *Sufiyan*, the Second Circuit held that because the BIA did not "determine that but-for the material support bar he would otherwise be eligible for protection," remand was necessary for the BIA to make such a finding. 177 F.4th at 120. Otherwise, DHS's practice would "deprive[]" a noncitizen "of an ability to be considered for an exemption for which he may well qualify." *Id.*

Petitioner's private interests are not lessened here because it is his own exercise of various appeal rights to his order of removal that have resulted in his prolonged detention. Although it is true that Petitioner might have forgone the rights granted him by statute to appeal his removal order, "the mere fact that a noncitizen opposes his removal is insufficient to defeat a finding of prolonged detention." *Garcia v. Decker*, 2023 WL 3818464, at *5 (S.D.N.Y. June 5, 2023). The courts in this Circuit rather have looked to whether the delay was the product of "dilatory or bad-faith tactics." *D.C. v. Noem*, 2026 WL 787895, at *7 (S.D.N.Y. Mar. 20, 2026) (quoting *J.C.G. v. Genalo*, 2025 WL 88831, at *10 (S.D.N.Y. Jan. 14, 2025)); *see also J.P.M.*, 807 F. Supp. 3d at 291 ("to conclude that Petitioner's voluntary pursuit of legal challenges renders the corresponding increase in time of detention reasonable, would effectively punish him for pursuing applicable legal remedies") (quoting *Giron v. Shanahan*, 2015 WL 5334046, at *4 (S.D.N.Y. Sep. 11, 2015)); *Villatoro v. Joyce*, 2024 WL 68533, at *5 (S.D.N.Y. Jan. 5, 2024) ("Although [the petitioner] has prolonged his detention, the Court shall not penalize [him] for raising and investigating non-frivolous claims."); *Hernandez v. Decker*, 2018 WL 3579108, at *9

32

(S.D.N.Y. July 25, 2018).  A petitioner cannot by engaging in bad-faith tactics or pursuing a baseless claim manufacture his own basis for release.

There is no basis to conclude that Petitioner has pursued his claim for asylum or withholding of removal in bad faith.  The IJ found his testimony to be credible and there is no dispute on this record that he was the victim of extortion by gangs in El Salvador, that his brother was murdered, and that he fears that if he is returned he or his family will be killed or seriously harmed.  The Government has offered no reason why the proceedings have been so protracted.  It appears simply to be because, as Petitioner asserted without contradiction at the hearing on his petition, appeals before the BIA are backlogged as a consequence of a shortage of judges, with no real prospect that the backlog will be alleviated at any point in the near future.

The first factor accordingly weighs strongly in favor of the Petitioner.

## B.    Risk of Erroneous Deprivation of Petitioner's Interests

The second factor for the Court to consider under the *Mathews* framework is "the risk of an erroneous deprivation of [Petitioner's] interest through the procedures used, and the probable value, if any, of additional substitute procedural safeguards."  *Mathews*, 424 U.S. at 335.  In analyzing this factor, "the only interest to be considered . . . is that of the detained individuals— not the government."  *Black*, 103 F.4th at 152.

This Court has previously found that for a petitioner detained under 1226(a), bond hearings held with the burden of proof on the petitioner to "prove a negative (i.e. that he was not a danger to the community or a flight risk" results in "a risk of erroneous deprivation."  *O.F.C.*, 2026 WL 74262, at *10 (citing *Velasco Lopez*, 978 F.3d at 851); *see J.C.G.*, 2025 WL 88831, at *7 ("Numerous courts in this district have held that 'where, as here, the Government seeks to detain a noncitizen pending removal pursuant to § 1226(a), the Fifth Amendment Due Process Clause requires the government to bear the burden of proving, by clear and convincing evidence,

33

that such detention is justified.'") (quoting *Banegas v. Decker*, 2021 WL 1852000, at \*2 (S.D.N.Y. May 7, 2021) (collecting cases)).

In his first bond determination, the IJ found that "Respondent met his burden to establish that he does not pose a danger to the community of the United States." Dkt. No. 19-4 at 7. In J.R.U.'s second bond hearing, the Government treated Petitioner as if he is subject to the mandatory detention provision of 8 U.S.C. § 1226(c), such that no showing with any burden of proof would have entitled him to temporary release. Dkt. No. 19-7. Unlike under Section 1226(a), "the 'procedures used' for section 1226(c) detainees are very few." *Black*, 103 F.4th at 152 (quoting *Mathews*, 424 U.S. at 335). "They include no mechanism for a detainee's release, nor for individualized review of the need for detention." *Id.* Given that there is a risk of error where bond hearings are available (albeit with the incorrect burden of proof), *see Velasco Lopez*, 978 F.3d at 852, it follows that the "less[er] procedural protections" under 1226(c) result in a "risk of erroneous deprivation [that] is correspondingly greater," *Black*, 103 F.4th at 152. That is, under the material support bar, "many noncitizens are detained 'who, for a variety of individualized reasons, are not dangerous, have strong family and community ties, are not flight risks and may have meritorious defenses to deportation at such time as they are able to present them.'" *Id.* (quoting *Lora v. Shanahan*, 804 F.3d 601, 605 (2d Cir. 2015)). Such risks are pronounced where, as here, it is not contested that J.R.U. has lived a peaceful and law-abiding life in the United States since his entry in 2015. "In the absence of any meaningful procedural safeguards, it appears that almost *any* additional procedural safeguards at some point in the detention would add value," including "an individualized bond hearing at which an IJ can consider the noncitizen's dangerousness and risk of flight." *Id.* at 153.

In *Black*, the Second Circuit found that there is "no doubt . . . that these minimal procedures led to an unwarranted detention." 103 F.4th at 153. One petitioner in *Black* had lived in the United States peacefully for "almost twenty years since his criminal conviction," and when given a bond hearing with the appropriately allocated burden of proof "he was released because the government could not justify his continued detention." *Id.* As to the other petitioner in *Black*, he led a "lawful life" for "four years after he completed his sentence," "maintained steady employment and helped provide for his family." *Id.* Those circumstances too "suggest[ed] a high likelihood that he was subject to an erroneous deprivation of liberty as his section 1226(c) detention was prolonged." *Id.* So too, here. There is nothing in the Petitioner's history on this record to suggest that he is either a flight risk or a danger to the community; as explained, in his time in this country Petitioner has held a steady job, raised a family, and paid his taxes. Pet. ¶ 141.[16]

To be sure, at J.R.U.'s second bond hearing the IJ found in the alternative that Petitioner was not entitled to release on bond because he was a flight risk, despite having made the opposite determination on essentially the same facts mere months earlier. Dkt. No. 19-7 at 6–8. But that does not undermine the Court's conclusion that there exists a serious risk that Petitioner's interests have been erroneously deprived based on the process he received. The only change was that in the intervening months, the IJ entered a final order of removal against J.R.U. *Id.* The IJ relied solely on the fact of Petitioner's removability (and the underlying reason for that removability) in finding that he was a flight risk. The IJ "acknowledge[d] that [J.R.U.] has significant community and family ties to the U.S.," that he "has lived in the U.S. for

---

[16] The Court does not foreclose the possibility that it will reach a contrary conclusion at the hearing it is ordering.

approximately ten years" and "has three children in the U.S." Dkt. No. 19-7 at 6. He noted too that J.R.U. "had steady employment," and is "committed to his church." *Id.* at 7. But, after placing the burden on Petitioner to show he was not a risk, the IJ found that because his "manner of entry into the country was marred by deception and failure to abide by the terms of his visa," *id.*, and because he "now has an order of removal entered against him," Petitioner "failed to meet his burden of proving that he is not a flight risk," *id.* at 8.

The IJ's analysis would prove too much—by nature of such proceedings, "every individual who appears before an Immigration Judge for custody redetermination lacks lawful status," such that a finding that this fact alone warrants detention would "lead to an automatic denial of bond in all cases." *Rosales v. Simon*, 2026 WL 688858, at *5 (E.D. Va. Mar. 11, 2026) (cleaned up); *see also Serrano v. Scott*, 2026 WL 1674357, at *7 (W.D. Wash. June 1, 2026); *Aslan v. Fereti Semaia*, 2026 WL 1722902, at *6 (C.D. Cal. June 11, 2026). Considering the numerous positive factors demonstrating that the Petitioner was not in fact a flight risk, with the burden of proof on the Government to make a showing of flight risk by clear and convincing evidence, there is "substantial likelihood that Respondents would have failed to meet their burden[.]" *O.F.C.*, 2026 WL 74262, at *10 (quoting *Hyppolite v. Noem*, 808 F. Supp. 3d 474, 492 (E.D.N.Y. 2025)).

This factor weighs heavily in favor of Petitioner.

### C.    The Government's Interest

The third *Mathews* factor considers "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335. The Government has identified two primary interests in support of Petitioner's continued detention: (1) ensuring the noncitizen's appearance at proceedings, and (2) protecting the community from noncitizens who have been

36

involved in crimes that Congress has determined differentiate them from others. Dkt. No. 17 at 14. "These interests are legitimate and their importance well-established." *Black*, 103 F.4th at 153 (citing *Demore*, 538 U.S. at 518–21, 527–28) (noting that section 1226(c) detention serves these dual purposes).

Importantly, however, the additional procedural safeguards allowed in *Black* (that is, a bond hearing with the burden of proof on the Government) "do nothing to undercut those interests," because "[a]t any ordered bond hearing, the IJ would assess on an individualized basis whether the noncitizen presents a flight risk or a danger to the community." *Black*, 103 F.4th at 153–54. Although "the [G]overnment's legitimate interests justify a relatively short-term deprivation of liberty, the balance of interests shifts as the noncitizen's detention is prolonged without any particularized assessment of need." *Id.* at 154 (internal citation omitted); *see O.F.C.*, 2026 WL 74262, at *11 ("[w]here the Government cannot establish a risk of danger or flight, *Velasco Lopez* instructs that its interest in detaining an individual not only evaporates—it flips"). Put differently, "there is no public interest in detaining individuals whom the Government cannot show to be a danger to the community[.]" *Id.* "[R]equiring a bail hearing where the Government must justify continued detention also 'minimize[s] the enormous impact of incarceration in cases where it serves no purpose,' which is of 'paramount' importance." *M.P.L. v. Arteta*, 2025 WL 2938993, at *7 (S.D.N.Y. Oct. 16, 2025) (quoting *Black*, 103 F.4th at 154). "Where the noncitizen poses no danger and is not a flight risk, all the government does in requiring detention is 'separate[] families and remove[] from the community breadwinners, caregivers, parents, siblings and employees.'" *Black*, 103 F.4th at 154 (quoting *Velasco Lopez*, 978 F.3d at 855).

The Court concludes that this factor too favors the Petitioner.

37

### III.    Relief

The questions remain what process Petitioner is due.  Petitioner seeks immediate release based on the IJ's initial findings that he was not a danger to the community, and because the fact that he has been ordered removed cannot establish him as a flight risk.  Pet. ¶ 180.  In the alternative, he seeks a hearing before this Court.  The Government argues that the remedy is a hearing and not immediate release.  Dkt. No. 17 at 1 ("even if Petitioner established a due process violation, the proper remedy is not immediate release as he requests.").  At oral argument on the Petition, it asserted that the Court should not honor the IJ's original decision at the first bond hearing that Petitioner could be released because it was entitled to present new evidence.

There is some force to Petitioner's argument.  Several courts have recently ordered release rather than a bond hearing on similar habeas petitions where "the existing record indicates that the Government could not possibly meets its heighted burden to justify continued detention."  *W.A.C. v. Rokosky*, 2026 WL 1383150, at *6 (D.N.J. May 18, 2026); *see also Pichardo Sosa v. Warden of Orange County Corrections*, 2026 WL 1803814, at *8 (S.D.N.Y. June 23, 2026) (granting release where the Government acknowledged that continued detention "would not serve the interests that the Government would be required to establish at the bond hearing."); *Tropskii v. Bondi*, 2025 WL 3016518, at *7 (E.D. Pa. Oct. 28, 2025) (granting release where it was clear that 1226(c) was inappropriately applied).

On the other hand, the courts in this Circuit routinely order hearings before an IJ where the Government bears the burden of proof by clear and convincing evidence both when a noncitizen has been detained under Section 1226(a) and when detention has been prolonged for a noncitizen detained under Section 1226(c).  *See Black*, 104 F.4th at 159[17]; *Velasco Lopez*, 978

---

[17] In *Black*, the Second Circuit affirmed the district court's decision to send the case to an IJ for a due process bond hearing, but the Circuit did not consider and nowhere indicated that that

F.3d at 855; *O.F.C.*, 2026 WL 74262, at *16; *M.P.L.*, 2025 WL 2938993, at *5; *J.C.G.*, 2025 WL 88831, at *11; *G.F.F.*, 2025 WL 3141735, at *7. Those courts have reasoned that immigration judges have the "expertise and experience" necessary to ensure the "efficient resolution of the proceedings consistent with immigration court precedents." *D.C.*, 2026 WL 787895 at *11. A minority of courts have ordered hearings before the district judge. Judge Chen has reasoned that while a federal court should defer to the immigration court "with respect to their areas of expertise and jurisdiction," no such deference is appropriate as to issues of constitutional dimension. *L.G.M. v. LaRocco*, 788 F. Supp. 3d 401, 405 (E.D.N.Y. 2025). "[F]ederal courts are the arbiters of constitutional rights such as those at issue in the Petition." *Id.*

The Court concludes that the Government should be given an opportunity to present evidence and argument to support Petitioner's continued detention but that such evidence and argument should be presented to the undersigned. Petitioner has not shown that his detention was "unlawful from its inception," and "the  gravamen of the constitutional wrong occurred sometime after his arrest," such that "the wrong might be redressed by something other than release." *O.F.C.*, 2026 WL 74262, at *14 (citing *Velasco Lopez*, 978 F.3d at 855). Nor does this case present the precise circumstances considered by the courts in *W.A.C.* or *Pichardo Sosa* that there supported immediate release. First, the Government here *does* dispute that "immediate release is an appropriate form of relief in this case," unlike in *Pichardo Sosa*. 2026 WL 1803814, at *7. The Government has not "acknowledged" that continued detention would not serve its interests, and argues to the contrary that it should be permitted to present evidence at a

---

hearing *had to occur* before the IJ rather than the district court as a matter of due process or otherwise. 103 F.4th at 147–51. The Circuit simply determined that the district court's fashioned remedy was appropriate without addressing the issue of venue.

bond hearing with respect to risk of flight. *Id.* at *8. Finally, there is at least one changed circumstance between Petitioner's prior release by the IJ and his current detention—the entry of a final order of removal against him. *Contra W.A.C.*, 2026 WL 1383150, at *6 (ordering release where the Government "cannot point to any changed circumstances . . . after terminating his supervision and re-detaining him.").

The Court will hold a hearing at which the Government will have the opportunity to justify Petitioner's continued detention by clear and convincing evidence. The Government does not dispute that the Court has the authority to conduct a hearing itself. As the Second Circuit and Supreme Court have explained, habeas corpus "is an 'adaptable remedy,' the 'precise application and scope' of which changes 'depending upon the circumstances.'" *Velasco Lopez*, 978 F.3d at 855 (quoting *Boumediene v. Bush*, 553 U.S. 723, 779 (2008)). "The 'flexible nature' of habeas relief affords district courts significant discretion over the appropriate remedies for violations of law and the Constitution." *Garcia Lanza v. Noem*, 822 F. Supp. 3d 326, 338 (E.D.N.Y. 2026) (citation omitted).

The gravamen of Petitioner's claim is that his detention has become unreasonably prolonged and that the Governmental interests that originally supported that detention are not sufficient to justify its continuation. The Second Circuit has recognized that such claim is of constitutional dimension. *See Black*, 103 F.4th at 153 (noting that petitioner Black was subject "to an unwarranted detention"). The immigration courts have no authority to rule on constitutional questions. *See United States v. Gonzalez-Roque*, 301 F.3d 39, 47 (2d Cir. 2002). Petitioner asserts "'the most significant liberty interest there is—the interest in being free from imprisonment.'" *Black*, 103 F.4th at 151 (quoting *Velasco Lopez*, 978 F.3d at 851). And it has further held that "while the government's legitimate interests justify a short-term deprivation of

40

liberty, the balance of interests shifts as the noncitizen's detention is prolonged without any particularized assessment of need." *Id.* at 154. It is appropriate that such hearing take place in front of an Article III court. "[T]he judiciary [has the] power to verify that detention does in fact have a valid rationale and a 'definite termination point.'" *Black v. Almodovar*, 156 F.4th 171, 200 (2d Cir. 2025) (Chin and Carney, JJ., statement in support of the denial of rehearing *en banc*); *see also id.* at 172 (Lohier, J., concurring in the denial of rehearing en banc).

This Court recently detailed why the reasons that "other courts have sometimes offered for holding these hearings before IJs are unpersuasive" on similar facts. *See Luciano-Jiminez v. Catletti*, 2026 WL 1831906, at *9–10 (S.D.N.Y. June 25, 2026). That is, although immigration courts have expertise with respect to immigration court precedents, "the bond hearings they have the most experience with are governed by different procedures than those required here." *Id.* at *9. Moreover, "this Court also has experience conducting detention hearings where," unlike at immigration court, "the ultimate question is, as here, whether the Government has established by clear and convincing evidence that the individual presents a danger to the community." *Id.* Additionally, as the Court explained, the "direction to the immigration judge to conduct a hearing also cannot be supported by any purported efficiencies." *Id.* Here, as in *Luciano-Jiminez*, backlogs in the immigration courts have caused the Petitioner's case to drag on, and there is neither justification nor "need to add to this backlog by requiring IJs to divert their attention from their normal dockets to conduct additional hearings that this Court itself has the capacity to conduct." *Id.* Finally, holding the hearing in this Court would also avoid the associated time and expenses that might accompany the need of this Court "to review IJ rulings to ensure compliance with conditional habeas orders." *Id.* (citing *Mendoza*, 2026 WL 1470652, at *5).

As for the process at that hearing, the Government must demonstrate by clear and convincing evidence that Petitioner is a risk of flight or a danger to the community, and the Court will consider alternatives to detention in assessing both flight risk and future dangerousness as well as Petitioner's ability to pay. *See id.* at *10.[18]

## CONCLUSION

The Court grants Petitioner's request for a hearing.  The parties are directed to meet and confer with respect to the evidence to be presented at such hearing and to appear telephonically for a prehearing conference on July 6, 2026.  The parties are instructed to dial 646-453-4442 and input conference ID 358639322.  The Court will hold a hearing  on July 13, 2026 at 10:00 a.m. in Courtroom 15C, 500 Pearl Street.

SO ORDERED.

Dated: June 29, 2026
New York, New York

_____
LEWIS J. LIMAN
United States District Judge

---

[18] Respondents here do not address Petitioner's request that, on remand, ability to pay be considered.  Pet. ¶ 161.  "[C]ourts in this District overwhelmingly agree that IJs must consider these two factors — alternatives to imprisonment and ability to pay — when determining bond for a detained immigrant."  *O.F.C. v. Decker*, 2022 WL 4448728, at *10 (S.D.N.Y. Sep. 12, 2022) (collecting cases); *see D.C.*, 2026 WL 787895, at *12; *J.C.G.*, 2025 WL 88831, at *10.